RECEIPT # 54029
AMOUNT $
SUMMONS ISSUED yes (10)
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 2-23-04

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AB MEDICAL EQUIPMENT CORP., Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

vs.

FLEETBOSTON FINANCIAL CORPORATION; COLUMBIA MANAGEMENT GROUP, INC.; COLUMBIA MANAGEMENT ADVISORS, INC.; COLUMBIA WANGER ASSET MANAGEMENT, L.P., COLUMBIA FUNDS DISTRIBUTOR, INC. COLUMBIA ACORN FUND, COLUMBIA ACORN SELECT, COLUMBIA ACORN USA, COLUMBIA ASSET ALLOCATION FUND, COLUMBIA BALANCED FUND. COLUMBIA COMMON STOCK FUND, COLUMBIA DISCIPLINED VALUE FUND, COLUMBIA DIVIDEND INCOME FUND, COLUMBIA GROWTH & INCOME FUND, COLUMBIA GROWTH FUND, COLUMBIA GROWTH STOCK FUND, COLUMBIA LARGE CAP CORE FUND, COLUMBIA LARGE CAP GROWTH FUND, COLUMBIA LARGE COMPANY INDEX FUND, COLUMBIA LIBERTY FUND, COLUMBIA MID CAP GROWTH FUND, COLUMBIA MID CAP VALUE FUND, COLUMBIA REAL ESTATE EQUITY FUND, COLUMBIA SMALL CAP FUND, COLUMBIA SMALL CAP VALUE FUND, COLUMBIA SMALL COMPANY EQUITY FUND, COLUMBIA SMALL COMPANY INDEX FUND, COLUMBIA STRATEGIC INVESTOR FUND, COLUMBIA TAX-MANAGED AGGRESSIVE GROWTH FUND, COLUMBIA TAX-MANAGED GROWTH FUND, COLUMBIA TAX-MANAGED GROWTH FUND II, COLUMBIA TAX-MANAGED VALUE FUND, COLUMBIA TECHNOLOGY FUND, COLUMBIA THERMOSTAT FUND,

**[Caption continued on next page]**

**CIVIL ACTION NO.**

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

**04-10355PBS**

MAGISTRATE JUDGE Collings

COLUMBIA UTILITIES FUND, COLUMBIA YOUNG INVESTOR FUND, COLUMBIA ACORN INTERNATIONAL FUND, COLUMBIA ACORN INTERNATIONAL SELECT FUND, COLUMBIA EUROPE FUND, COLUMBIA GLOBAL EQUITY FUND, COLUMBIA INTERNATIONAL EQUITY FUND, COLUMBIA INTERNATIONAL STOCK FUND, COLUMBIA NEWPORT ASIA PACIFIC FUND, COLUMBIA NEWPORT JAPAN OPPORTUNITIES FUND, COLUMBIA NEWPORT GREATER CHINA FUND, COLUMBIA NEWPORT TIGER FUND, COLUMBIA CONTRARIAN INCOME FUND, COLUMBIA CORPORATE BOND FUND, COLUMBIA FEDERAL SECURITIES FUND, COLUMBIA FIXED INCOME SECURITIES FUND, COLUMBIA FLOATING RATE ADVANTAGE FUND, COLUMBIA FLOATING RATE FUND, COLUMBIA HIGH YIELD FUND, COLUMBIA HIGH YIELD OPPORTUNITY FUND, COLUMBIA INCOME FUND, COLUMBIA INTERMEDIATE BOND FUND, COLUMBIA INTERMEDIATE GOVERNMENT INCOME FUND, COLUMBIA MONEY MARKET FUND, COLUMBIA QUALITY PLUS BOND FUND, COLUMBIA SHORT TERM BOND FUND, COLUMBIA STRATEGIC INCOME FUND, COLUMBIA US TREASURY INDEX FUND, COLUMBIA CALIFORNIA TAX-EXEMPT FUND, COLUMBIA CONNECTICUT INTERMEDIATE MUNICIPAL BOND FUND, COLUMBIA CONNECTICUT TAX-EXEMPT FUND, COLUMBIA FLORIDA INTERMEDIATE MUNICIPAL BOND FUND, COLUMBIA HIGH YIELD MUNICIPAL FUND, COLUMBIA INTERMEDIATE TAX-EXEMPT BOND FUND, COLUMBIA MANAGED MUNICIPALS FUND, COLUMBIA MASSACHUSETTS INTERMEDIATE MUNICIPAL BOND FUND, COLUMBIA MASSACHUSETTS TAX-EXEMPT FUND, COLUMBIA MUNICIPAL MONEY MARKET FUND, COLUMBIA NATIONAL MUNICIPAL BOND FUND,

**[Caption continued on next page]**

COLUMBIA NEW JERSEY INTERMEDIATE MUNICIPAL BOND FUND, COLUMBIA NEW YORK INTERMEDIATE MUNICIPAL BOND FUND, COLUMBIA NEW YORK TAX-EXEMPT FUND, COLUMBIA OREGON MUNICIPAL BOND FUND, COLUMBIA PENNSYLVANIA INTERMEDIATE MUNICIPAL BOND FUND, COLUMBIA RHODE ISLAND INTERMEDIATE MUNICIPAL BOND FUND, COLUMBIA TAX-EXEMPT FUND, COLUMBIA TAX-EXEMPT INSURED FUND, COLUMBIA SMALL CAP GROWTH FUND , COLUMBIA EUROPEAN THEMATIC EQUITY FUND, COLUMBIA GLOBAL THEMATIC EQUITY FUND, COLUMBIA DAILY INCOME COMPANY FUND; COLUMBIA ACORN TRUST, COLUMBIA BALANCED FUND INC./OR, COLUMBIA COMMON STOCK FUND INC., COLUMBIA DAILY INCOME COMPANY, COLUMBIA FIXED INCOME SECURITIES FUND INC., COLUMBIA FLOATING RATE ADVANTAGE FUND, COLUMBIA FLOATING RATE FUND, COLUMBIA FUNDS TRUST I, COLUMBIA FUNDS TRUST II, COLUMBIA FUNDS TRUST III, COLUMBIA FUNDS TRUST IV, COLUMBIA FUNDS TRUST IX, COLUMBIA FUNDS TRUST V, COLUMBIA FUNDS TRUST VI, COLUMBIA FUNDS TRUST VII, COLUMBIA FUNDS TRUST VIII, COLUMBIA FUNDS TRUST XI, COLUMBIA GROWTH FUND INC., COLUMBIA HIGH YIELD FUND INC., COLUMBIA INSTITUTIONAL FLOATING RATE INCOME FUND, COLUMBIA INTERNATIONAL STOCK FUND INC., COLUMBIA MID CAP GROWTH FUND INC., COLUMBIA OREGON MUNICIPAL BOND FUND INC., COLUMBIA NATIONAL MUNICIPAL BOND FUND INC., COLUMBIA REAL ESTATE EQUITY FUND INC., COLUMBIA SHORT TERM BOND FUND INC., COLUMBIA SMALL CAP GROWTH FUND INC.,

**[Caption continued on next page]**

COLUMBIA STRATEGIC INVESTOR FUND INC., COLUMBIA TECHNOLOGY FUND INC.; and DOES 1 - 100,

Defendants.

Plaintiff, AB Medical Equipment Corp. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Columbia Family of Mutual Funds and advisories about the funds, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of a class (the "Class") of all purchasers, redeemers and holders of Columbia family of funds (as defined below), who purchased, held, or otherwise acquired shares between February 13, 1999 and January 14, 2004 (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), the Investment Company Act of 1940 (the "Investment Company Act"), and for common law breach of fiduciary duties.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b), and 20(a) of the Exchange Act, [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5]. Additionally, this action arises under Sections 11 and 15 of the Securities Act

of 1933 (the "Securities Act") [15 U.S.C. §§ 77k, 77l(a)(2), and 77(o)] and pursuant to §§ 34 and 36 of the Investment Company Act [15 U.S.C. §§ 80a-33 and 35].

3. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act of 1934 [15 U.S.C. § 78aa]; Section 22 of the Securities Act [15 U.S.C. § 77v]; and §§ 34 and 36 of the Investment Company Act [15 U.S.C. § 80a-35].

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

6. Plaintiff AB Medical Equipment Corp. bought and held shares of Columbia Acorn Fund during the Class Period and has suffered damages as a result of the wrongful acts of defendants as alleged herein.

7. Defendant FleetBoston Financial Corporation ("FleetBoston") is a financial services company and the ultimate parent of defendants bearing the Columbia name. FleetBoston maintains its corporate headquarters at 100 Federal Street, Boston, Massachusetts 02110.

8. Defendant Columbia Management Group, Inc. ("Columbia Group"),a wholly owned subsidiary of FleetBoston, is the asset management arm of FleetBoston. Through its member firms, including Columbia Management and Columbia Wanger Asset Management, L.P. ("Columbia

Wanger"), Columbia Group offers asset management services and financial products. Columbia Group is located at One Financial Center, Boston, MA 02111-2621.

9. Defendant Columbia Management Advisors, Inc. ("Columbia Management"), a wholly-owned subsidiary of Columbia Group, offers investment products and money management services. Columbia Management is registered as an investment advisor under the Investment Advisers Act and, together with Columbia Wanger, managed and advised the Columbia Funds during the Class Period. Columbia Management, along with Columbia Wanger, has ultimate responsibility for overseeing the day-to-day management of the Columbia Funds. Columbia Management is headquartered at 100 Federal Street, Boston, Massachusetts 02110.

10. Defendant Columbia Wanger, a wholly-owned subsidiary of Columbia Group, offers investment products and money management services. Columbia Management is registered as an investment advisor under the Investment Advisers Act and, together with Columbia Management, managed and advised the Columbia Funds during the Class Period. Columbia Wanger, along with Columbia Management, has ultimate responsibility for overseeing the day-to-day management of the Columbia Funds. Columbia Wanger is headquartered at 227 West Monroe, Suite 3000, Chicago, Illinois 60606.

11. Columbia Management, Columbia Group and Columbia Wanger are referred to collectively herein as the "Columbia Advisors."

12. Columbia Funds Distributor, Inc. ("Columbia Distributor"), a subsidiary of FleetBoston, was the distributor of the Columbia Funds during the Class Period. Columbia Distributor maintains its headquarters at One Financial Center, Boston, Massachusetts 02111.

13.     Defendants Columbia Acorn Trust, Columbia Balanced Fund Inc., Columbia Common Stock Fund Inc., Columbia Daily Income Company, Columbia Fixed Income Securities Fund Inc., Columbia Floating Rate Advantage Fund, Columbia Floating Rate Fund, Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust IV, Columbia Funds Trust IX, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust XI, Columbia Growth Fund Inc., Columbia High Yield Fund Inc., Columbia Institutional Floating Rate Income Fund, Columbia International Stock Fund Inc., Columbia mid Cap Growth Fund Inc., Columbia Oregon Municipal Bond Fund Inc., Columbia National Municipal Bond Fund Inc., Columbia Real Estate Equity Fund Inc., Columbia Short Term Bond Fund Inc., Columbia Small Cap Growth Fund Inc., Columbia Strategic Investor Fund Inc., Columbia Technology Fund Inc. (collectively referred to as the "Fund Registrants.") are the registrants of the Columbia Family of Mutual Funds.

14.     Defendants Columbia Acorn Fund, Columbia Acorn Select, Columbia Acorn USA, Columbia Asset Allocation Fund, Columbia Balanced Fund, Columbia Common Stock Fund, Columbia Disciplined Value Fund, Columbia Dividend Income Fund, Columbia Growth & Income Fund, Columbia Growth Fund, Columbia Growth Stock Fund, Columbia Large Cap Core Fund, Columbia Large Cap Growth Fund, Columbia Large Company Index Fund, Columbia Liberty Fund, Columbia Mid Cap Growth Fund, Columbia mid Cap Value Fund, Columbia Real Estate Equity Fund, Columbia Small Cap Fund, Columbia Small Cap Value Fund, Columbia Small Company Equity Fund, Columbia Small Company Index Fund, Columbia Strategic Investor Fund, Columbia Tax-Managed Aggressive Growth Fund, Columbia Tax-Managed Growth Fund, Columbia Tax-managed Growth Fund II, Columbia Tax-Managed Value Fund, Columbia Technology Fund,

Columbia Thermostat Fund, Columbia Utilities Fund, Columbia Young Investor Fund, Columbia Acorn International Fund, Columbia Acorn International Select Fund, Columbia Europe Fund, Columbia Global Equity Fund, Columbia International Equity Fund, Columbia International Stock Fund, Columbia Newport Asia Pacific Fund, Columbia Newport Japan Opportunities Fund, Columbia Newport Greater China Fund, Columbia Newport Tiger Fund, Columbia Contrarian Income Fund, Columbia Corporate Bond Fund, Columbia Federal Securities Fund, Columbia Fixed Income Securities Fund, Columbia Floating Rate Advantage Fund, Columbia Floating Rate Fund, Columbia High Yield Fund, Columbia High Yield Opportunity Fund, Columbia Income Fund, Columbia Intermediate Bond Fund, Columbia Intermediate Government Income Fund, Columbia Money Market Fund, Columbia Quality Plus Bond Fund, Columbia Short Term Bond Fund, Columbia Strategic Income Fund, Columbia US Treasury Index Fund, Columbia California Tax-Exempt Fund, Columbia Connecticut Intermediate Municipal Bond, Columbia Connecticut Tax-Exempt Fund, Columbia Florida Intermediate Municipal Bond Fund, Columbia High Yield Municipal Fund, Columbia Intermediate Tax-Exempt Bond Fund, Columbia Managed Municipals Fund, Columbia Massachusetts Intermediate Municipal Bond Fund, Columbia Massachusetts Tax-Exempt Fund, Columbia Municipal Money Market Fund, Columbia National Municipal Bond Fund, Columbia New Jersey Intermediate Municipal Bond Fund, Columbia New York Intermediate Municipal Bond Fund, Columbia New York Tax-Exempt Fund, Columbia Oregon Municipal Bond Fund, Columbia Pennsylvania Intermediate Municipal Bond Fund, Columbia Rhode Island Intermediate Municipal Bond Fund, Columbia Tax-Exempt Fund, Columbia Tax-Exempt Insured Fund, Columbia Small Cap Growth Fund, Columbia European Thematic Equity Fund, Columbia Global Thematic Equity Fund, Columbia Daily Income Company Fund (collectively referred to as

the " Columbia Funds") are mutual funds that are registered under the Investment Company Act and managed by the Columbia Advisors.

15. The true names and capacities (whether individual, corporate, associate, or otherwise) of defendants Does 1 through 100, inclusive, and each of them, are unknown to Plaintiff, who sues said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the defendants fictitiously named herein is legally responsible in some actionable manner for the events described herein, and thereby proximately caused the damage to the Plaintiff and the members of the Class.

## CLASS ACTION ALLEGATIONS

16. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all purchasers, redeemers and holders of the mutual fund shares that are the subject of this lawsuit, who purchased, held, or otherwise acquired shares between December 15, 1998 and December 8, 2003, inclusive, (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

18. Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

19. Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

20. A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

21. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether Defendants breached their fiduciary duties by engaging in fraudulent activity; and

(c) Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

22. This action concerns a fraudulent scheme and course of action which was intended to and indeed did benefit mutual funds and their advisors at the expense of mutual fund investors. In connection therewith, defendants violated their fiduciary duties to their customers in return for substantial fees and other income for themselves and their affiliates.

23. The defendants' wrongful conduct involved "timing" of mutual funds. "Timing" is an investment technique involving short-term, "in and out" trading of mutual fund shares. The technique is designed to exploit inefficiencies in the way mutual fund companies price their shares. It is widely acknowledged that timing inures to the detriment of long-term shareholders. Because of this detrimental effect, mutual fund prospectuses typically state that timing is monitored and the funds work to prevent it. Nonetheless, in return for investments that will increase fund managers' fees, fund managers enter into undisclosed agreements to allow timing.

24. In fact, certain mutual fund companies have employees (generally referred to as the "timing police") who are supposed to detect "timers" and put a stop to their short-term trading activity. Nonetheless, defendants arranged to give market timers a "pass" with the timing police, meaning the timing police would look the other way rather than attempt to shut down their short-term trading.

25. The mutual fund prospectuses for the funds at issue created the misleading impression that mutual funds were vigilantly protecting investors against the negative effects of timing. In fact, the opposite was true: defendants sold the right to time their funds to other hedge fund investors. The prospectuses were silent about these arrangements.

26. As a result of the "timing" of mutual funds, the Doe Defendants, other timers, and defendants and their intermediaries profited handsomely. The losers were unsuspecting long-term mutual fund investors. Defendants' profits came dollar-for-dollar out of their pockets.

**TIMING**

27. Mutual funds are designed for buy-and-hold investors, and are therefore the favored homes for Americans' retirement and college savings accounts. Nevertheless, quick-turnaround traders routinely try to trade in and out of certain mutual funds in order to exploit inefficiencies in the way they set their Net Asset Values or "NAVs."

28. This strategy works only because some funds use "stale" prices to calculate the value of securities held in the fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that holds Japanese shares. Because of the time zone difference, the Japanese market may close at 2:00 a.m. New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his or her fund to arrive at an NAV at 4:00 p.m. in New York, he or she is relying on market information that is fourteen hours old. If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and the fund's NAV will be artificially low. Put another way, the NAV does not reflect the true current market value of the stocks the fund holds. On such a day, a trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling. Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

29. Effective timing captures an arbitrage profit. The arbitrage profit from timing comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days -- as the Doe Defendants did -- the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

30. Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their transaction costs on the long-term investors. Indeed, trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market. Accordingly, fund managers often seek to minimize the disruptive impact of timers by keeping cash on hand to pay out the timers' profits without having to sell stock. This "strategy" does not eliminate the transfer of wealth out of the mutual fund caused by timing; it only reduces the administrative cost of those transfers. However, at the same time it can also reduce the overall performance of the fund by requiring the fund manager to keep a certain amount of the funds's assets in cash at all times, thus depriving the investors of the advantages of being fully invested in a rising market. Some fund managers even enter into special investments as an attempt to "hedge" against timing activity (instead of just refusing to allow it), thus deviating altogether from the ostensible investment strategy of their funds, and incurring further transaction costs.

31. Mutual fund managers are aware of the damaging effect that timers have on their funds. While it is virtually impossible for fund managers to identify every timing trade, large

movements in and out of funds -- like those made by the Doe Defendants-- are easy for managers to spot. And mutual fund managers have tools to fight back against timers.

32. Fund managers typically have the power simply to reject timers' purchases. As fiduciaries for their investors, mutual fund managers are obliged to do their best to use these weapons to protect their customers from the dilution that timing causes.

33. The incentive to the defendant mutual funds to engage in such wrongdoing is as follows. Typically a single management company sets up a number of mutual funds to form a family. While each mutual fund is in fact its own company, as a practical matter the management company runs it. The portfolio managers who make the investment decisions for the funds and the executives to whom they report are, all typically employees of the management company, not the mutual funds themselves. Still, the management company owes fiduciary duties to each fund and each investor.

34. The management company makes its profit from fees it charges the funds for financial advice and other services. These fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the manager makes. The timer understands this perfectly, and frequently offers the manager more assets in exchange for the right to time. Fund managers have succumbed to temptation and allowed investors in the target funds to be hurt in exchange for additional money in their own pockets in the form of higher management fees.

35. Thus, by keeping money -- often many million dollars -- in the same family of mutual funds (while moving the money from fund to fund), The Doe Defendants assured the manager that he or she would collect management and other fees on the amount whether it was in the target fund, the resting fund, or moving in between. In addition, sometimes the manager would waive any

applicable early redemption fees. By doing so, the manager would directly deprive the fund of money that would have partially reimbursed the fund for the impact of timing.

36. As an additional inducement for allowing the timing, fund managers often received "sticky assets." These were typically long-term investments made not in the mutual fund in which the timing activity was permitted, but in one of the fund manager's financial vehicles (e.g., a bond fund or a hedge fund run by the manager) that assured a steady flow of fees to the manager.

37. These arrangements were never disclosed to mutual fund investors. On the contrary, many of the relevant mutual fund prospectuses contained materially misleading statements assuring investors that the fund managers discouraged and worked to prevent mutual fund timing.

**THE SCHEME WITHIN THE COLUMBIA FUNDS**

38. On September 3, 2003, the New York State Attorney General Elliot Spitzer (the "Attorney General") attacked the mutual fund industry by filing a complaint charging fraud against Stern and Canary in connection with the unlawful mutual practices of late trading and timing. More specifically, the Attorney General alleged the following: "Canary developed a complex strategy that allowed it to in effect sell mutual funds short and profit on declining NAVs." Additionally, the Attorney General alleged that Canary set up arrangements with Bank of America, Bank One, Janus, and Strong to late trade and time those companies' respective mutual funds. The Attorney General further alleged:

> Bank of America . . .(I) set Canary up with a state-of-the art electronic late trading platform, allowing it to trade late in the hundreds of mutual funds that the bank offers to its customers, (ii) gave Canary permission to time the Nations Funds Family (iii) provided Canary with approximately $300 million of credit to finance this late trading and timing, and (iv) sold Canary the derivative short positions it needed to time the funds as the market dropped. None of these facts were disclosed in the Nations Funds prospectuses. In the process,

> Canary became one of Bank of America's largest customers. The relationship was mutually beneficial in that Canary made tens of millions through late trading and timing, while the various parts of the Bank of America that serviced Canary made millions themselves.

39. In connection with an examination of active trading of mutual fund shares by the United States Securities and Exchange Commission ("SEC") and the Attorney General, defendants received inquiries and subpoenas for documents from those agencies.

40. On January 15, 2004, before the market opened, FleetBoston announced that Columbia Management and Columbia Funds Distributor had received Wells notices from the SEC. More specifically, FleetBoston stated:

> In a separate development, FleetBoston said that earlier this month two of its subsidiaries, Columbia Management Advisors, Inc., and Columbia Funds Distributor, Inc., received "Wells" notices stating that the SEC Regional Office staff in Boston had made a preliminary determination to recommend that enforcement action be brought against them, alleging that certain fund prospectuses did not accurately disclose, in violation of fiduciary duties, certain trading activity in fund shares. We believe that the allegations relate to a limited number of trading arrangements occurring in the period 1998-2003. The majority of trades made pursuant to these arrangements were made by three entities and occurred in one international and two domestic funds. None of these arrangements is in existence today. The subsidiaries intend to engage in discussions with the SEC in an effort to reach a satisfactory resolution of these matters.

41. On January 16, 2004, defendants filed with the SEC a prospectus supplement for various Columbia Funds which provided further detail on various investigations of the Fund Defendants commenced by the SEC and the New York Attorney General. The prospectus supplement stated:

> Legal Proceedings. Columbia Management Advisors, Inc. ("CMA"), the Funds' adviser, and Columbia Funds Distributor, Inc. ("CFDI") the distributor of the Funds' shares, and certain of their affiliates

(collectively, "Columbia") have received information requests and subpoenas from various regulatory authorities, including the Securities and Exchange Commission ("SEC") and the New York Attorney General, in connection with their investigations of late trading and market timing in mutual funds. Columbia has not uncovered any instances where CMA or CFDI were knowingly involved in late trading of mutual fund shares.

Columbia has identified a limited number of investors who had informal arrangements for trading Fund shares between 1998 and 2003. A majority of the transactions in connection with these arrangements occurred in one international fund and two domestic funds. The majority of the trading under these arrangements was made by three entities. A substantial majority of the trading had ended by October 2002. None of these arrangements exists today. Information relating to those trading arrangements has been supplied to various regulatory authorities. To the extent that any Fund whose shares were involved in those trading activities was harmed by them, Columbia has undertaken to reimburse the Fund.

The SEC staff has issued notices to the effect that it has made a preliminary determination to recommend that the SEC bring civil enforcement actions, including injunctive proceedings, against CMA and CFDI, alleging that they have violated certain provisions of the federal securities laws. Columbia believes that those allegations are based principally on the trading arrangements referred to above. CMA and CFDI are engaged in discussions with the SEC staff in an effort to reach a satisfactory resolution of these matters. However, there can be no assurance that such a resolution will be reached. Any potential resolution of these matters may include, but not be limited to, sanctions, financial penalties, damages or injunctions regarding CMA or CFDI, and structural changes in the conduct of their business.
Although Columbia does not believe that these regulatory developments or their resolution will have a material adverse effect on the Funds, or on the ability of CMA and CFDI to provide services to the Funds, there can be no assurance that these matters or any adverse publicity or other developments resulting from them will not result in increased redemptions or reduced sales of Fund shares, which could increase transactions costs or operating expenses, or other consequences for the Funds.

42. In a letter to shareholders dated January 30, 2004, Joseph Palombo ("Palombo"), Chief Operating Officer of Columbia Management and James Tambone ("Tambone"), Co-President

of Columbia Distributor admitted that the defendants were the subject of the investigation into mutual fund trading activities by the SEC and the New York State Attorney General. Palombo and Tambone stated:

> Columbia Management is:
>
> Cooperating with Inquiries and Investigations As you may have read, during recent weeks and months, the Securities and Exchange Commission ("SEC"), the New York Attorney General and other authorities have been investigating mutual fund trading activities of firms across the US. Columbia Management is one of the firms included in these investigations. Specifically, Columbia Management Advisors, Inc. ("CMA"), the advisor to the Columbia Family of Funds, and Columbia Funds Distributor, Inc. ("CFDI"), the distributor of the Columbia Family of Funds, and certain of their affiliates (collectively, "Columbia") have received and responded to information requests and subpoenas from various authorities. Columbia Management has and will continue to cooperate fully with all requests for information and subpoenas.
>
> Reviewing Historical Trading Activity
>
> • Columbia Management does not knowingly permit late trading. Furthermore, we have not uncovered any instances where Columbia employees were knowingly involved in late trading of mutual fund shares.
>
> • Columbia Management has identified a limited number of investors who had informal arrangements for trading fund shares between 1998 and 2003. A majority of the transactions in connection with these arrangements occurred in one international fund, the Columbia Newport Tiger Fund, and two domestic funds, the Columbia Growth Stock Fund and the Columbia Young Investor Fund. The majority of the trading under these arrangements was made by three entities. A substantial majority of the trading had ended by October 2002 and none of these arrangements exists today. If it is determined that the affected funds were harmed by these trading arrangements, CMA will reimburse them.
>
> • Columbia Management holds all asset management professionals to a high ethical standard and monitors their trading activity on an ongoing basis. Columbia Management has determined that one

> portfolio manager, who managed the Columbia Small Company Equity Fund, an approximately $400 million fund, made frequent trades through his 401(k) account in both the fund that he managed and other funds. Although the underlying trades made by this portfolio manager were relatively small, his trading was not consistent with the ethical standards of Columbia Management. Columbia Management terminated the portfolio manager's employment upon discovery of his trading activity. Information about the portfolio manager's trading activity has been provided to the SEC and the New York Attorney General. If it is determined that the affected funds were harmed by the portfolio manager's trading activity, CMA will reimburse them.

43. On February 13, 2004, The Wall Street Journal reported that the FleetBoston confirmed that the defendants permitted and facilitated improper market timing in at least three Columbia Funds, the Columbia Young Investor Fund, Columbia Newport Tiger Fund, and the Columbia Growth Stock Fund, in violation of the explicit policies against such trading activity contained in the Funds' prospectuses. The article reported the following:

> Mutual-Fund employees at a unit of FleetBoston Financial Corp. improperly allowed "market-timers" to conduct rapid fire trades in three funds—including one targeted at children—according to the company and people familiar with the trading.
>
> Rapid trading in the $855 million Young Investor Fund could prove especially embarrassing for Fleet because the revelation means employees in its sales arm allowed the fast-moving investors to skim profits from kids. The fund, founded by Fleet's Stein Roe unit and now called the Columbia Young Investors Fund, focuses on stocks that "meet the needs of young consumers" and has its own child-centered Web site, younginvestor.com, to teach kids the value of starting to invest at a young age.
>
> Yesterday, Boston-based Fleet also acknowledged that its Columbia Funds unit and predecessor Liberty allowed trading in the $371 million Newport Tiger Fund and the $855 million Stein Roe Growth Stock Fund. Fleet also said that it would reimburse investors for losses caused by market-timing activity.

* * *